## NATIONAL LABOR RELATIONS BOARD v. SOUTHPORT PETROLEUM CO.

### No. 9517.

Circuit Court of Appeals, Fifth Circuit.

Jan. 4, 1941.

Rehearing Denied Feb. 1, 1941.

Robert B. Watts, Gen. Counsel, and Walter B. Wilbur, both of Washington, D. C., for National Labor Relations Board.

F. W. Fischer, of Tyler, Tex., and Harry Dow, of Houston, Tex., for respondent.

Before FOSTER, HUTCHESON, and HOLMES, Circuit Judges.

HOLMES, Circuit Judge.

Pursuant to hearings had upon complaints filed by the Oil Workers International Union, Local No. 227, against the Southport Petroleum Company, the National Labor Relations Board found that the company was engaging in certain unfair labor practices. Accordingly, the Board ordered the company to cease and desist therefrom, and to take certain affirmative action.[1] The order is before us on a petition to enforce, requiring us to determine whether it is supported by substantial evidence.

The entire order is based upon the findings of the Board that Cornish, Richey, and Gooch were discharged because of union activities, and that, because of the discharges, the employees were interfered with and restrained in the exercise of their rights to organize and bargain collectively through representatives of their own choosing. We shall briefly summarize the evidence relating to the discharge of each, which evidence, in our opinion, adequately supports the findings made by the Board and the order entered thereon.

William Cornish was employed by the Southport Company on June 24, 1935. He

---

[1] The order required the Southport Petroleum Company to cease and desist from:

"(a) Discouraging membership in Oil Workers International Union, Local No. 227, or in any other labor organization of its employees, by discharging its employees or by otherwise discriminating in regard to * * * employment;

"(b) In any other manner interfering with, restraining, or coercing its employees in the exercise of the rights * * * guaranteed in Section 7 of the Act."

And to take the following affirmative action:

"(a) Offer to William Cornish, E. D. Richey, and Earl Gooch immediate and full reinstatement to their former positions, without prejudice of their seniority and other rights and privileges;

"(b) Make whole each of said men for loss of pay suffered by reason of their discharge by paying each a sum of money equal to that which he would normally have earned from the date of his discharge to the date of the offer of reinstatement, less the earnings of each, respectively, during said period;

"(c) Post appropriate notices; and

"(d) Notify the Regional Director, within ten days of the date of the order, of the steps taken to comply with the order."

was an electrician, and performed his work so well that he was repeatedly praised by his superiors and repeatedly raised in pay. He was one of the first to join the union, and became active in its efforts to organize the employees. He was elected vice-president of the union, was named acting secretary of the Texas City branch, was a member of the Workmen's Committee, and chairman of the Organizing Committee. As a member of the Workmen's Committee, Cornish appeared before Lee LaFerney, the manager of the company, more than once in efforts to arrange a conference between the union and the management. He was discharged on Wednesday, August 4, 1937, when he appeared for work at 9:30, two-and-one-half hours after he was scheduled to begin work; he was delayed because of an appointment with his dentist that morning. Cornish failed to notify the management that he would be delayed, contenting himself with notifying his assistant. He testified that his presence was not imperative; that his assistant was capable of performing the routine duties; that he regularly took off one day a week, which day varied with the demands of his work, and of which he was required to give no notice to the management; that the occasion of his discharge was the only time he had been late during his entire employment with the company. On August 2, 1937, the company told an applicant for a job as electrician that they were contemplating making a change, and that he could expect employment soon.

E. D. Richey was discharged by his brother-in-law, a foreman in the plant, allegedly for repeatedly appearing for work in a drunken condition. The foreman testified that he had carried Richey home from work on several occasions in a drunken condition, and that he was too intoxicated properly to do his work on the day of his discharge. Richey denied that he was, or had ever been, drunk or drinking while performing his duties. Fellow workmen testified that they had never seen Richey drinking or drunk while working, and that, in their opinion, his work was satisfactory. The foreman acknowledged that, on each of the occasions when Richey was drunk, he had assigned work to him. This work was of a nature that, if carelessly performed, might result in serious damage. Less than a month before his discharge, Richey was given the office of Steward in the union, and collected the dues of the members.

Earl Gooch was employed by the company for four-and-one-half years as a welder. He joined the union, was active in soliciting membership in it, was elected acting secretary, and served on the Organizing Committee. On August 4, 1937, which was the date on which Cornish was discharged, Gooch's employment was terminated, under the guise of a transfer, when he was sent to do welding work for an independent contractor engaged in construction work at a branch plant belonging to respondent. After that work was completed, Gooch was informed that he was no longer employed by the Southport Petroleum Company. The officers of the company testified that Gooch was discharged because the company no longer had sufficient welding work to keep him busy, and because his "outside interests" had seriously impaired the value of his services. Several employees testified that another man was transferred to take Gooch's place, and that two subordinate workmen were elevated to the rank of welder subsequent to his discharge.

When the organization of the union was in its inception, LaFerney called a meeting of the employees, at which he mentioned that there were "outside interests" working on the employees which were after the employees' money, not their welfare; and he cautioned the men to be careful. When the union committee went to LaFerney seeking a conference with the management, LaFerney declined the request. He told the committee that, if they knew what he knew about the executives of the union, they would go after them with a shotgun. M. M. Travis, secretary and part owner of the company, testified that he objected to dealing with his employees through unions. At one time he told Gooch, "Mr. Lewis will look after himself, and it is up to you to look after yourself."

Prior to the discharges of these men, the union employees freely exhibited their union insignias, regularly attended the weekly meetings of the union, and participated in various union activities with enthusiasm. The membership steadily increased. After the three officers of the union were discharged, the members stopped working openly for it, membership lagged, attendance at the meetings dropped sharply, and

the forward progress of the union was stopped.

When the treatment accorded each of these employees is considered in the light of the hostility of the management to the union, we think the finding of the Board that they were discharged because of union activities was fully warranted by the evidence. The men were officers in, and most active members of, the union, and their discharges followed closely upon their elevation to union offices. That the purpose of the management was realized is further attested by the cessation of overt union activities by the other employees of the company almost simultaneously with the discharges of the men. It was therefore a fair and reasonable inference of the Board that they were discharged because of their union activities. [2]

Respondent has filed in this court an application for leave to adduce additional evidence to the effect that, subsequent to the entry of the order by the Board, it disposed of all of its assets, and was dissolved. Respondent is a Texas corporation. Under the laws of that state the corporation, upon dissolution, is continued in existence for a period of three years for the purpose of suing and being sued. [3] Conceding that the dissolution has taken place, it can have no effect upon this proceeding.

Since the order of the Board is in all respects supported by substantial evidence, a decree will be entered directing that it be enforced.

[2] International Association of Machinists v. N. L. R. B., November, 1940, 61 S. Ct. 83, 85 L.Ed. ——, Solvay Process Co. v. N. L. R. B., 5 Cir., Jan., 1941, 117 F. 2d 83.

[3] Articles 1388, 1389, Vernon's Texas Annotated Civil Statutes; Chevrolet Motor Co. of Texas v. Morris Auto Co., Tex. Civ.App., 269 S.W. 872; Eastman, Gardiner & Co. v. Warren, 5 Cir., 109 F.2d 193.