## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### William B. ALLEN, Allcon, Inc. and Allen Concrete, Inc., Respondents.

Nos. 83–5784, 83–5933.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 22, 1984.

Decided April 8, 1985.

Joseph Frankl (argued), Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for petitioner.

Ray Leffler (argued), W. Bruce Swain, Brackhahn, McNeil, Swain & Hughes, Memphis, Tenn., for respondents.

Before EDWARDS * and KEITH, Circuit Judges, and JOHNSTONE, District Judge.**

GEORGE CLIFTON EDWARDS, Jr., Circuit Judge.

Respondent William B. Allen is the son of S.G. Allen who founded a construction company in Memphis in 1939 and then added a small ready-mix concrete plant to supply his contracting needs and then developed a substantial building and supply company with expanded ready-mix operations. These operations were organized into four closely-held corporations and they were merged in 1972 into Allen Materials, Inc.; the shareholders of which were S.G. Allen, his wife Pernie Allen, and his son William. S.G. Allen died in 1975 leaving his stock to the four children of his son William.

From the 1950's, the employees of the Allens' various companies were represented by Teamsters Local 984. At peak, the Local represented 75 employees of the Allens. These were covered by collective bargaining agreements which dated back to 1969.

In 1978, Allen Materials, Inc. filed for reorganization under Chapter 11 of the Bankruptcy Act. Thereafter, the business was operated as Allen Materials, Inc., Debtor-in-Possession ("AMIDIP"). In March of 1980, AMIDIP renewed its collective bargaining agreement with Teamsters Local 984. The term of the agreement was from March 1, 1980 to March 1, 1983.

On June 26, 1981, Respondent William Allen called a meeting of at least seven drivers who were then employed by AMIDIP. According to testimony of three witnesses found consistent and credible by the ALJ, Allen told the drivers that the Company was bankrupt, that it was "going to be up under another name," and that the new company would be non-union. He stated his desire to hire five and, ultimately, ten drivers. According to the testimony of driver Jesse Sykes, Allen told the men they were welcome to continue working for the new company, even though a lawyer had advised that he fire all of them. He allowed that seniority would be retained, but declared that he "want[ed] no parts of the Union anymore." ALJ Opinion at 6; Tr. 317–319, 327–328, 363–364.

On July 1, 1981, Allen chartered the new company, Allcon, Inc. The NLRB quotes the charter as reciting that Allcon was "to engage in production, sale and delivery of ready-mix concrete, building materials, concrete blocks, sand and gravel, and to offer data processing services" (i.e. the identical services which the prior company, AMIDIP, offered). Respondents respond that this language was mere "boilerplate" and that Allcon never engaged in anything more than a substantially scaled down ready-mix operation. Although Allcon paid its drivers the same wage scale they were earning at AMIDIP, Allcon refused to abide by the collective bargaining agreement with AMIDIP and would not recognize the Union.

In April 1982, Allen incorporated Allen Concrete, Inc., whose charter authorized it "to make, produce, process, transport, package, store, buy and sell ready-mix concrete, building materials, concrete blocks, sand and gravel" and to carry out related activities. According to Respondents, Allen Concrete, Inc. consisted of William Allen as president and general manager and a partnership comprised of Allen, E.L. Dye and Earl Mize, both former supervisors of

---

* Honorable George Edwards took senior status January 15, 1985.

** Honorable Edward H. Johnstone, United States District Court for the Western District of Kentucky, sitting by designation.

both AMIDIP and Allcon. Respondents describe Allen Concrete, Inc. as a company without employees. It exists, they say, merely to supply ready-mix concrete for driveway/patio construction work done by the partnership, which uses only contract labor. At the time of the hearing, Allen Concrete, Inc. had not issued stock. It listed its office as the same Moriarty Road site where Allcon operated. However, Respondents state in their reply brief that the corporation is now operated out of William Allen's home.

The Teamsters petitioned the NLRB for relief from William Allen's refusal to bargain with them on the ground that the company currently operated by Allen is the alter ego of the predecessor corporations.

The case was heard before an ALJ who held that under the facts and the law, the present Respondents are alter egos for the original contracting entities.

The ALJ's opinion said in part:

It would seem that the requisites of an *alter ego* or successorship relationship between Respondents and their nominal predecessor party to the subsisting collective agreement here—which Respondents continue totally to ignore and claim in no way affects their operations—are met in the instant case. Thus, as found above, William B. Allen continues to be the common strand, linchpin, principal, operator, and guiding star of the business, as well as each of the "enterprises," in question; and, although that business has, after its expansion, undergone a contraction to its earlier proportion, it continues to be a ready-mix concrete business, conducted in the same manner, at one of its same locations, under the same supervision, with the same unit employees and customers—although, to be sure, not as many. All of this has taken place without hiatus in operations. Under these circumstances, it is clear that the subsisting collective agreement cannot simply be "shucked off," cast overboard, and ignored through the device of creating a succession of new corporations with somewhat different names.

ALJ Opinion at 8.

The ALJ then found that the Respondents were liable for the unfair labor practices alleged by the Union on the basis of the alter ego doctrine and recommended a bargaining order.

Our review of this record confirms the findings of fact by the ALJ and the Board. The facts herein represent an alter ego case. *See Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 62 S.Ct. 452, 86 L.Ed. 718 (1942). There the refinery was the subject of an NLRB order to cease and desist from engaging in certain unfair labor practices. The refinery did not comply. After considerable delay, it entered into a stipulated obedience agreement, but three days later the refinery company (a Texas corporation) liquidated and a new Delaware corporation was formed. The Board sought enforcement against the Delaware corporation and the Fifth Circuit Court of Appeals granted it. The Supreme Court (Jackson, J.) affirmed, saying:

Implicit in the reinstatement provision of the Board's order was a condition of the continued operation by the offending employer of the refinery to the employment of which the illegally discharged employees were to be restored. Such operation might have continued under the old business form or under a disguise intended to evade this provision. If there was merely a change in name or in apparent control there is no reason to grant the petitioner relief from the Board's order of reinstatement; instead there is added ground for compelling obedience. Whether there was a *bona fide* discontinuance and a true change of ownership—which would terminate the duty of reinstatement created by the Board's order—or merely a disguised continuance of the old employer, does not clearly appear, and accordingly is a question of fact properly to be resolved by the Board on direct resort to it, or by the court if contempt proceedings are instituted.

315 U.S. at 106, 62 S.Ct. at 455 (footnotes omitted).

We grant enforcement of the Board's order.